UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

FILED (SG)
US DISTRICT COURT CLERK
WESTERN DISTRICT OF KY

05 NOV 23 AM 10: 52

| | |
|---|---|
| KCH SERVICES, INC.<br><br>          Plaintiff,<br><br>v.<br><br>VANAIRE, INC.<br>    **Serve**:  Guillermo J. Vanegas<br>             10151 Bunsen Parkway<br>             Louisville, KY 40299<br><br>and<br><br>GUILLERMO VANEGAS<br>1707 Arnold Palmer Boulevard<br>Louisville, KY  40245<br><br>and<br><br>SCOTT FREEMAN<br>2668 Whitesides Road<br>Forest City, NC 28043<br><br>    **Serve**:  Secretary of State<br>            New Capitol Building<br>            Frankfort, KY  40601<br><br>                            Defendants. | Case No.: _3:05-CV- 777-C_ |

## COMPLAINT

Plaintiff KCH Services, Inc., through counsel, for its Complaint against Defendants, Vanaire, Inc., Guillermo Venegas, and Scott Freeman (collectively "Defendants"), states as follows:

## INTRODUCTION

This is an action seeking injunctive relief and damages against the Defendants for having stolen critical, proprietary, trade secret software belonging to KCH Services, Inc. ("KCH"), for having failed to implement appropriate corporate governance and/or corporate ethics policies which would have further alerted the employees of defendant, Vanaire, Inc. ("Vanaire") about the importance of respecting the proprietary nature of another party's trade secrets, and for having made disparaging, defamatory comments about KCH which damaged KCH's relationships with its clients and with those in the industry.

## THE PARTIES

1.      KCH is a corporation organized under the laws of the state of North Carolina with a principal place of business at 144 Industrial Drive in Forest City, North Carolina.

2.      Vanaire is a corporation organized under the laws of the Commonwealth of Kentucky with a principal place of business at 10151 Bunsen Way in Louisville, Kentucky.

3.      Guillermo Vanegas ("Vanegas") is a natural person residing at 1707 Arnold Palmer Boulevard in Louisville, Kentucky and is the president of Vanaire.

4.      Scott Freeman ("Freeman") is a natural personal residing at 2668 Whitesides Road, Forest City, North Carolina and is an employee at Vanaire.

## JURISDICTION AND VENUE

5.     This Court has original jurisdiction over the subject matter of this action pursuant to the federal question jurisdiction conferred by 28 U.S.C. § 1331.

6.   Venue is proper in the Western District of Kentucky at Louisville pursuant to 28 U.S.C. § 1391 (b).

## FACTS

## KCH

7.     KCH is a small, privately-held designer, manufacturer and installer of air pollution emission control and ventilation systems ("Systems").

8.     The Systems, commonly known in the industry as industrial scrubbers ("Scrubbers") remove certain pollutants from the exhausts of manufacturing facilities requiring metal finishing, such as those of automotive manufacturers, defense contractors, semiconductor manufacturers and aerospace industries.

9.     The air pollution control industry in which KCH competes is especially competitive.  As manufacturers leave the United States competition for servicing such remaining manufacturers increases.  The phenomenon has been at work for some years.

10.    KCH's industry, though competitive, is not sizeable.  Only a relatively small number of businesses design, manufacture and install such Systems.

### The Production Process

11.    The process of laying out and cutting out to create Systems is labor-intensive.  A considerable number of work hours are required to manually lay-out each

3

individual piece onto a paper pattern, transfer that pattern to the material and then hand cut the material.

12.     The laying out and hand cutting process also inherently contains the risks of human error, which considerably jeopardizes the development of a given System.

13.     In approximately 1991 KCH's president, Kenneth Charles Hankinson ("Hankinson"), observed a machine used in the signage industry known as a programmable router.  The router cuts material into certain forms to cut the fabrication material into specified shapes. Hankinson sought to obtain a critical, competitive advantage for KCH.  He sought to reduce the labor costs of hand-directing the cutting out and laying out by automating the process through the creation of specially designed, proprietary, trade secret software (the "Software").

14.     Hankinson believed that by designing such Software, he could dramatically reduce the number of working hours needed to complete a given System and thereby obtain pricing advantages over his competitors, while at the same time reducing the risks of human error.

### Creating the Software

15.     To realize his goal, Hankinson directed Douglas Holt ("Holt"), the engineer at KCH, to design the Software.  Holt was an engineer, draftsman and computer programmer who, at the time, was in charge of drafting and computer programming.

16.     Holt would soon recognize that designing such Software would require years of work.  In order to create the Software he needed to create numerous

triangulations procedures requiring vast knowledge in trigonometry, computer programming, engineering, and plastic fabrication.

17.     As Holt expected, he worked for years on developing the Software. He drew upon KCH's understanding of its clients' needs and the knowledge of his coworkers at KCH who had created and installed Systems for some of the largest industrial companies in the world.

18.     Initially, progress was slow, but Holt persisted. Holt started with the simplest form of layout and then continued to more complex forms which, by the early 1990's, ultimately allowed KCH to layout, cutout, and process the majority of parts fabricated in the ventilation industry, thus practically eliminating the human error element during the process. By 1993, Holt had substantially completed his work. The Software was ready for use.

### Realizing the Strategic Advantage

19.     KCH immediately began to realize its competitive advantage from Holt's work. After 1993 KCH would find itself using the Software for ninety-nine percent of its projects requiring router cuttings. KCH protected the Software by insuring that all copies of it would remain at KCH, and by keeping the Software from being released into the public domain, or released to clients and/or competitors.

20.     The Software enhanced KCH's ability to compete, even as large, industrial manufacturers were leaving the United States to set up facilities in foreign countries. (Most foreign countries soliciting manufacturing businesses do not require the use of Scrubbers).

21.   The Scrubber industry has since become even more competitive as additional manufacturing clients have left the United States.

**Vanaire**

22.   KCH and Vanaire are competitors and have been for years.

23.   KCH and Vanaire often seek the same work from the same client often involving the very same project. Their respective solutions in response to a prospective client's request for quotations are typically not dissimilar.

24.   Over the years, some KCH employees have left to seek employment with Vanaire. One such individual was a manager of the drafting department, which oversees and is responsible for layout and cutout, by the name of Scott Freeman ("Freeman") of North Carolina. Freeman worked for KCH from February 11, 1985 until September 11, 2000 when he left to start his own business. Approximately one year later Freeman was hired by Vanaire.

25.   Another KCH employee who left to join Vanaire was Art Brooks ("Brooks"). Brooks left KCH to work for Vanaire on August 22, 1995 and rejoined KCH on August 9, 2004.

26.   Upon Brooks' return to KCH, he learned that the Software developed by KCH to run the routers was an extremely labor-intensive, resource-draining exercise which took years to complete. This information came to Brooks through conversations with Holt who had designed and created the Software.

27.   With the benefit of this information from Holt, Brooks then recalled certain conversations he had engaged in while still employed at Vanaire, wherein

6

Freeman casually suggested that he had copied some KCH information onto a compact disk. Freeman made the statement: "You would be surprised what you can get on a compact disk." (In those conversations, Freeman did not identify to Brooks the content of the information on the CD).

28.   With the information newly obtained from Holt, given Freeman's prior experience at KCH and access to the Software, and after reflecting upon the fact that Vanaire did not have a unit dedicated to designing and creating such Software, Brooks became suspicious.

29.   Ray Steele ("Steele"), a former KCH employee who, in approximately July of 2001, joined Vanaire had a close relationship with Freeman. Steele also was the individual at Vanaire who would have been responsible for addressing the technical and production issues relative to router use.

30.   KCH also learned that Vanaire had received a large contract for the Tinker Air Force Base in Tulsa, Oklahoma. The use of a router would greatly enhance profits and production on this project due to the amount of labor hours and precision of cuts demanded by the job. Vanaire had their router operational within *only days* of purchasing the router, and as KCH knew that such is not possible without the Software, KCH's suspicions grew.

31.   By September of 2005, KCH reached the inescapable conclusion that Freeman must have transferred the Software to Vanaire.

32.    On September 30, 2005 Hankinson contacted Vanegas.   In their short discussion, Hankinson informed Vanegas that Freeman had taken the Software with him when he left KCH and had transferred it to Vanaire.

33.    Vanegas promptly denied the accusations.   When Hankinson responded by asking Vanegas how it was possible for Vanaire to automate its routers without software, Vanegas responded that he "obtained the software on the internet." Hankinson responded by asking Vanegas during this discussion to place the software in use by Vanaire, and the Software created by KCH, with an independent third-party for forensic evaluation in order to determine whether the software which Vanaire admitted to using was indeed KCH's.  Vanegas declined.  Vanaire continued using the KCH Software until sometime on or about October 20, 2005.

34.    Contrary to Vanegas' claims, no such software exists on the internet.   In fact, no such software exists in the industry, which is why KCH designed and created such Software.

### Destroying and Concealing the Evidence

35.    On or about October 28, 2005 Keith Philbeck ("Philbeck"), a former Vanaire employee, contacted Hankinson.  Philbeck had just been terminated by Vanaire for allegedly having leaked information to KCH concerning Vanaire's misappropriation of KCH's technology.

36.    Philbeck met in person with Hankinson on November 11, 2005.  Philbeck informed Hankinson that he specifically recalled Vanegas expressly demanding,

sometime in the very recent past, that the technicians at Vanaire were to "get rid of any evidence of KCH Software."

## Vanaire's Conduct

37.   Throughout the period of time relevant to the allegations in this Complaint, namely the time of Freeman's departure from KCH to Vanaire, up until the present, Vanaire failed to develop, create or employ any corporate code of ethics that would have alerted Vanaire employees to recognize that they should not use the trade secrets and technologies belonging to others, regardless of how the technologies and trade secrets may have made their way to Vanaire.

38.   Vanaire's unfair business practices extend beyond the conduct described above. Vanaire, through its employee, Kurt Jones, who was formerly a KCH employee, has made quite damaging, disparaging comments about KCH to KCH's clients, such as comments stating that KCH is an extremely unstable company. These comments were designed to cause KCH's clients to be concerned about using KCH as a vendor and were untrue when they were made.

39.   KCH will continue to be irreparably harmed should Vanaire continue to use and/or release the Software. KCH has suffered damages from Vanaire's use of the Software and Vanegas' conduct.

40.   Specifically, as a result of Vanaire's and Vanegas' conduct, KCH was deprived of its ability to obtain contracts, to meet its financial obligations to its vendors, was forced to auction-off assets and equipment to meet payroll, laid off employees, endured increased interest rates from its bank due to noncompliance with certain

covenants, suffered morale loss and eventually had no choice but to seek protection under Chapter 11 of the United States Bankruptcy Code and, of course, lost the profits KCH would have otherwise made.

**COUNT I**
**VIOLATION OF THE KENTUCKY UNIFORM TRADE SECRETS ACT**
**KRS § 365.880 ET SEQ.**
**(Directed to All Defendants)**

41.    KCH realleges and incorporates herein by reference its allegations in Paragraphs 1 through 40 above, as if fully set forth herein.

42.    By engaging in the acts and conduct described above, Defendants have unlawfully misappropriated KCH's trade secrets, including confidential and proprietary Software, in violation of the Kentucky Uniform Trade Secrets Act, KRS § 365.880, et seq.

43.    The Software was exclusively created by KCH for its own competitive and business advantage, and has independent economic value.    It is not readily ascertainable by proper means, and is not in the public domain.   KCH has taken reasonable efforts to maintain and protect the secrecy of its Software.

44.    Through the acts set forth above, KCH's trade secrets, in the form of its confidential and proprietary Software, were misappropriated by Defendants in that such Software (a) was acquired by improper means; (b) was disclosed improperly; and (c) was used by Defendants without KCH's proper consent.

45.    Defendants' continued use of KCH's Software is not authorized by KCH.

46.    As a direct and proximate result of Defendants' wrongful misappropriation, which was done willfully and maliciously, KCH has sustained and will continue to sustain substantial damages in an amount to be proven at trial.

47.    Such damages include both the actual loss caused by the misappropriation and the unjust enrichment caused by the misappropriation that is not taken into account in computing actual loss.

**COUNT II**
**MISAPPROPRIATION, CONVERSION AND THEFT**
**(Directed to All Defendants)**

48.    KCH realleges and incorporates herein by reference its allegations in Paragraphs 1 through 47 above, as if fully set forth herein.

49.    By engaging in the acts and conduct described above, Defendants have unlawfully misappropriated and converted KCH's trade secrets, including confidential and proprietary Software, in violation of common law.

50.    The Software was exclusively created by KCH and has independent economic value. It is not readily ascertainable by proper means and is not in the public domain. KCH has taken reasonable efforts to maintain and protect the secrecy of its Software.

51.    Defendants' continued use and control over KCH's property is not authorized by KCH.

52.    KCH has made a demand upon Defendants for them to cease and desist from their continued utilization of KCH's confidential and proprietary Software and for Defendants to return same to KCH.

11

53.     Despite this demand, Defendants have wrongfully retained, and continue to wrongfully retain, possession of KCH's confidential and proprietary Software.

54.     As a direct and proximate result of Defendants' wrongful activities, which were made willfully and maliciously, KCH has sustained and will continue to sustain substantial damages in an amount to be proven at trial.

55.     As a further direct and proximate result of Defendants' misappropriation, conversion and theft of KCH's confidential and proprietary Software, KCH is entitled to recover punitive damages in an amount to be proven at trial.

**COUNT III**
**FEDERAL COPYRIGHT INFRINGEMENT, 17 U.S.C. § 501**
**(Directed to All Defendants)**

56.     KCH realleges and incorporates herein by reference its allegations in Paragraphs 1 through 55 above, as if fully set forth herein.

57.     The Software created by KCH constitutes Plaintiff's copyright property. All of KCH's copyrighted Software contains original material that constitutes copyrighted subject matter under the copyright laws of the United States.

58.     Defendants had access to KCH's Software.

59.     Defendants have reproduced, distributed and used KCH's Software without authority.

60.     Defendants' conduct constitutes willful infringement under the copyright laws of the United States.

61.    KCH is entitled to recover damages from Defendants, including attorney fees it has sustained and will sustain, as well as any gains, profits and advantages obtained as a result of the violation of copyright laws.

## COUNT IV
## NEGLIGENCE
### (Directed to Defendants Vanaire and Vanegas)

62.    KCH realleges and incorporates herein by reference its allegations in Paragraphs 1 through 61 above, as if fully set forth herein.

63.    By engaging in the acts and conduct described above, Defendants Vanaire and Vanegas negligently failed to develop or employ any corporate code of ethics that would have alerted their employees to refrain from using the proprietary trade secrets and confidential technologies of other entities.

64.    Defendants Vanaire and Vanegas had a duty to KCH to have appropriate policies and procedures in place to ensure that Vanaire's employees acted ethically in their treatment and use of another entity's protected trade secrets and confidential proprietary property.

65.    Defendants Vanaire and Vanegas breached that duty.

66.    As a direct and proximate result of this breach and the aforesaid negligence of these Defendants, KCH has sustained and will continue to sustain substantial damages in an amount to be proven at trial.

## COUNT V
## DEFAMATION
### (Directed to Vanaire)

67.     KCH realleges and incorporates herein by reference its allegations in Paragraphs 1 through 66 above, as if fully set forth herein.

68.     Defendants' disparaging comments about KCH, including but not limited to the comments about KCH being an unstable company and the inference the KCH could not service its clients, as described above, are defamatory as to KCH; were published; and caused injury to KCH's reputation.

69.     The defamatory comments tend to lower KCH in the estimation of relevant individuals and entities, and have injured, and will continue to injure, KCH's business.

70.     As a direct and proximate result of Defendants' defamatory statements, KCH has sustained and will continue to sustain substantial damages in an amount to be proven at trial.

## COUNT VI
## INJUNCTIVE RELIEF
### (Directed to All Defendants)

71.     KCH realleges and incorporates herein by reference its allegations in Paragraphs 1 through 70 above, as if fully set forth herein.

72.     KCH has the sole and exclusive right to possess and utilize its confidential and proprietary Software.

73.     KCH has already suffered an economic loss as a result of Defendants' misappropriation, conversion, theft and continued use of KCH's proprietary Software.

74.   There is no adequate remedy at law to sufficiently protect KCH from the irreparable harm it has suffered and will continue to suffer if Defendants are not enjoined from wrongfully retaining and using KCH's confidential and proprietary Software.

75.   Thus, KCH is entitled to immediate injunctive relief, restraining and permanently enjoining Defendants from wrongfully retaining and using KCH's confidential and proprietary Software.

**WHEREFORE**, Plaintiff KCH Services, Inc. demands judgment against Defendants as follows:

1.   Judgment in its favor on all claims asserted in its Complaint against Defendants;

2.   Punitive damages;

3.   Injunctive relief as outlined herein;

4.   It's costs and attorney fees herein expended;

5.   A trial by jury of issues so triable; and

6.   All other relief to which it may be entitled.

Respectfully submitted,

Patrick W. Michael
Joseph P. Donohue
Michelle M. Harper
WOODWARD, HOBSON & FULTON, LLP
2500 National City Tower
Louisville, Kentucky 40202
(502) 581-8000
Fax: (502) 581-8111

*Counsel for Plaintiff KCH Services, Inc.*